The next case today is Christopher Bruce v. Worcester Regional Transit Authority et al., appeal number 21-1293 and appeal number 21-1300. Attorney Bloom, please introduce yourself for the record and proceed with your argument. Thank you. Good morning, your honors. May it please the court. My name is Will Bloom, and I'm representing Appellant Chris Bruce, and Judge Howard, I'd like to reserve two minutes for rebuttal, if I may. Yes. Thank you so much, your honor. There are three key issues with the district court's grant of summary judgment to the defendants in this case. First, the district court made serious errors of both fact and law on the question of whether Mr. Bruce's speech as union president was pursuant to his duties as a backlot bus driver. Second, it misapplied the correct standard for whether Mr. Bruce faced First Amendment retaliation. And third, it declined to draw all reasonable inferences in support of Mr. Bruce, the non-moving party, in granting defendants motion, instead making hard factual conclusions that were best left for the jury to decide. Now, I'd like to focus on those last two issues first. In concluding Mr. Bruce was terminated not because he gave the interview, the district court's decision did not even mention, much less analyze and rely upon, the contemporaneous memo of James Parker, the decision maker, in which he memorialized his reason for firing Mr. Bruce at the time. In that memo, which you can read on page 49 of the appendix, Mr. Parker's words show plainly that Mr. Bruce's speech was a necessary but for cause of his firing. The lead reason that memo gave for Mr. Bruce's termination was his unauthorized media interview, a protected act of speech. He further said that it was a very difficult decision that he made because he thought Mr. Bruce had done so to, quote, thumb his nose at the company. Had the district court correctly applied the standard from Pickering and Mount Healthy, it would have seen that this memo shows that Mr. Bruce's speech was a substantial and motivating factor in his termination. Drawing from that evidence all reasonable inferences against the defendant, it would be impossible to find that Mr. Bruce's unauthorized media interview was not a substantial or motivating factor. Now, appellees in this case have tried to muddy the waters on this by making expansive after-the-fact claims about alternative reasons why the decision to fire Mr. Bruce would be justified. At the time of his firing, they did not offer any specific safety rules or work orders that Mr. Bruce violated, and in depositions were unable to identify what orders or rules Mr. Bruce had broken. Now, however, they claim that driving at five miles an hour on an created a serious safety concern. As we lay out in our brief, under the Pickering tests required balancing of Mr. Bruce and the public's First Amendment interest in his speech against the government's interests in promoting the efficient performance of a public service, the lack of any measurable harm or possibility of harm or disruption to the efficiency of WRTA's operations show that those concerns are without merit. But even if they weren't, it wouldn't matter because the question is not whether they could have fired him for another reason, but whether they would have fired him for another reason. And this question, which is essentially a state-of-mind question, is fact-intensive and very difficult to determine on summary judgment. The best evidence we have is Mr. Parker's own written explanation of his thinking, which does not say that he would have fired him even without the speech. Instead, it highlights the, quote, unauthorized speech as the lead reason for his termination. The evidence shows that it drove the company's ire, that it drove them to take action. Mr. Parker's memo stated... When you say the speech act, I just want to make sure I understand exactly what you're focused on. Is the idea that there's a First Amendment right to give an unauthorized media interview? The idea is that there is a First Amendment right to give that interview. That's not what I asked. Is there a First Amendment right to give an unauthorized media interview? As applied here, we believe that the interview that Mr. Bruce gave was protected by the First Amendment, whether or not he had the authorization of the employer, yes. Let me just understand, what is the basis for thinking that there's a First Amendment right to give an unauthorized interview? Well, in this case, Your Honor, Mr. Bruce was not So the basic idea is that an employer can't have a broad rule for its employees, government employees, that they can't give interviews in their own individual capacity without seeking prior authorization. That First Amendment forbids that. That's our position, yes, Your Honor. Yeah. Is that true even with respect to the interview being given during working hours? Well, Your Honor, we believe that, yes, it would be, because under the Pickering Test's second factor, speech at work cannot axiomatically be, cannot, you know, as an absolute matter, be banned. Yeah, but what about a requirement that if you're going to give a media interview during working hours, that has to be authorized? Does the First Amendment prohibit that? We believe that the First Amendment would prohibit that if it does not pass the balancing act. What's the best authority for that under just the Pickering balancing? We believe, yes, we believe that the Pickering balancing says that if giving that interview does not materially create any disruption for the employer's operations, they cannot ban it as a matter of fact. And is the right way to think about that case by case, or is the right way to think about that whether the policy under Pickering is legitimate of saying at work, if during working hours, while you're on the job, if you're going to give a media interview in your own personal capacity, you have to get approval first. If I can ask Your Honor to clarify the question, is the question whether that policy is a matter of, we should, whether, excuse me, let me, let me, I think I can answer what I think the question is. We believe that this policy, which is applied as a blanket matter, is unconstitutional because it does not include that kind of balancing of efficiency and the interests of the speaker and the public. So an employee at work can say anything it wants to say when it impacts the employer because their justification for getting the pre-approval is that they didn't want the public to think that they were pressuring their employees into giving these statements. Your Honor, I would say no, an employee cannot say whatever they want. I think that if the employee is speaking in a way that creates the kind of disruption to efficiency imagined under the second factor of Pickering, then the employer would have, you know, would have the right to take action. That's what the balancing test. But that's the situation in which the discipline would be for the interview's content. The discipline here is for violating a policy requiring prior authorization. What's the problem under the First Amendment with requiring the prior authorization, given the concerns the employer might have about trying to make sure that in the setting on the job where this interview is going to occur, it won't look like they're pressuring them. It's just a notice requirement, in a sense. At least it's a notice requirement. What's wrong with that? Well, we believe that the issue there would be that the restraint of creating that kind of blanket rule restricts legitimate discourse on, excuse me, restricts the legitimate discourse around these issues of public concern by these workers as private citizens. And let me just, last question, does the pre-authorization requirement here distinguish between whether the interview is going to occur during working hours or not? Does the policy prohibit that, or excuse me? Does the policy requiring there to be a media interview, the policy itself, what does it purport to apply to while you're at work? I would like to refer to the language just to make sure. But as I recall, the policy does not specify whether or not someone is on working hours. It says whether someone is going to speak on WRTA matters. That is when the policy requires prior authorization, if I'm remembering the language correctly. I'm sorry, I couldn't hear you. The policy says what specifically? Apologies, Judge Thompson. I don't, I'm trying to find the language in front of me, but as I recall, the policy does not specify whether or not the employee is on work hours. What it specifies is whether the employee is speaking on matters related to WRTA. If I may continue, because I would like to also take a minute to wrap up this portion of your argument. Sure. So yes, on the question of determination, as we said, they offer these other reasons. None of those reasons were offered with any specificity at the time. The best evidence we have as to Mr. Parker's thinking at the time was the contemporaneous memo, which the district court below did not even mention in the opinion, much less analyze or rely upon. And we think it's also incredibly relevant and was not brought into this question below that repeatedly throughout this period, as if I recall on the same day that Mr. Bruce was terminated, Mr. Parker was sending emails to employees encouraging to have substantially similar conversations with employees. So to claim that Mr. Bruce violated safety rules by driving quite slowly on an empty back lot with an empty bus for a few minutes when they were encouraging all of their drivers to have substantially similar conversations on busy streets with busy buses all day long is suspect in our opinion. I'd like to move on to the Garcetti question, which would be part of the first Pickering standard. I'm going to give you 30 seconds on that, and then we're going to move to your opponent. It sounds good, Your Honor. Very briefly, we believe that, you know, this circuit should adopt the rule that's been adopted by the 6th, 7th, and 9th circuits, as well as the District of Rhode Island in this circuit, that when a union member or union leader speaks in that capacity, it's axiomatically speech as a private citizen. Even if the circuit does not adopt that, we believe that the errors made below, including confusing Mr. Bruce's job responsibilities at his previous job as a union representative with his job responsibilities as a job as a bus driver, in addition to misunderstanding one of the Dakotas factors stating that a reasonable observer would think that Mr. Bruce was a WRTA employee rather than speaking on behalf of WRTA, shows that under the Garcetti test as laid out in Dakotas, Mr. Bruce's speech would be found to be protected. Thank you, Your Honors. Thank you. If you would mute your audio and video for the time being. And we'll hear from Mr. Conte. Yes, Your Honor. Good morning again. Thomas Conte for the Appellees. Your Honor, the court should affirm the decision of the U.S. District Court in this matter, granting summary judgment in favor of the defendant's appellees. There is no genuine dispute of material fact. And absent the claims with respect to speech, plaintiff Christopher Bruce still would have been terminated for two other class two infractions, disciplinary infractions that he committed, pursuant to the last chance return to work agreement that he signed in or about March of 2017. And concerning the other infraction, the U.S. District Court summed it up best in a quote, where it said, this is on page 18 and 19 of its order. And I quote, put another way, Bruce was terminated for permitting Telemundo to interview him while he was on duty, driving a bus, not because he gave the interview or for anything he said in the interview. So, Your Honor, as a result, the three claims at issue, the section 1983 claim, the plaintiff couldn't meet his burden. Also under the Massachusetts Civil Rights Act, with respect to a key element that's missing, threats, intimidation, coercion, Mr. Bruce attempted to claim that just the termination itself meant that element. It does not under the cases we've cited under the last chance return to work agreement. He was an employee at will with, again, a long disciplinary record had previously been terminated. And finally, with respect to the tortious interference claim, another key element was missing. He couldn't show actual malice and it doesn't appear that they briefed that issue. And as a result, all of those claims were properly decided by the lower court. Can you say one thing for me, Mr. Conte? Where there were three reasons given for the termination, one of which was the interview. How is it not a jury question for a jury to decide whether he would have otherwise been terminated? Well, your honor, I believe if you actually go, so what I would do is track your honor back to the memorandum for record that was being referred to by my opponent. And that is in the record at appendix 49. And if you look at that memorandum that was signed by Mr. Parker, he says that I asked them to sit down and I went through each of the three charges which led to my decision. So all three charges were his basis for termination. Chris acknowledged, this is Christopher Bruce, that he committed the offenses, but he felt he deserved another chance. And then Parker goes on to say, I explained that I felt the coordination of an unauthorized media interview combined with a completely unsafe manner in which it was conducted while he was on the clock should have been driving the bus back to the garage led to my decision to terminate. So your honor, that doesn't answer Judge Howard's question. Are you saying that no reasonable jury could find that he wasn't terminated? I mean, that the reason he was terminated was the speech? That's correct, your honor. That's what I am saying. And why I'm saying that is because based on Mr. Bruce's admissions and the other person who is in this meeting was Mr. Gephardt, who was business agent for Local 22, the union. And Mr. Gephardt was the Local 22 30B6 designate. And in his deposition testimony, he testified that this memorandum for record was an accurate recitation of that meeting. Completely accurate. Mr. Bruce, so Mr. Bruce was in this meeting, Mr. Gephardt and... Mr. Conte, let me ask you this way. Are you saying that the policy complies with the First Amendment? Just the policy itself? What I'm saying, your honor, I think... But I just want to understand. Do you think the policy complies with the First Amendment? I do, your honor. If it doesn't, doesn't the statement that it was a factor in the termination mean it's at least a jury question as to whether it was a factor? I don't think so, your honor, because under the analysis for a section 1983 claim, you still have two other offenses. Yeah, but isn't it at least a jury question when you have a memo saying it was a factor? I don't believe so, your honor, because each of those, if you go back to the last chance agreement, any class 2 violation, any class 2 violation is grounds for termination. So if you leave aside... Memo you cited does not say that he would have been terminated independently for each of the the memos suggest that it was the combination of the three. I don't think that's right, your honor. I think the fact is you have the union's representative, Kephart, who represented Bruce during the proceeding, both for the last chance agreement as well as now in this proceeding, and he acknowledged that each one of these charges stood independently. But doesn't, isn't Bruce now saying we were encouraged to make, to do these kind of interviews, and so I don't think I violated the unauthorized statements. And why isn't, why doesn't that create a factual question? I don't think it does, your honor, because first off, the speech itself, the speech itself was not unfavorable or unhelpful. So if you look at the Tiverton case, where you have a situation where a union leader was approaching a superintendent about union negotiations, that wasn't this harmony wasn't caused by the speech or unfavorable speech. The disharmony was caused by Mr. Bruce engaging in an interview when he's supposed to be on the clock, when he's supposed to be on duty. That's undisputed that he was on duty. Yeah, but is it undisputed that it wasn't that it was an unauthorized interview? I thought he was now disputing whether it was authorized or he's trying to your honor, this is where he's trying to change his tune. He never, he never disputed that he was required just as he did. So your honor, that's why that memorandum for record is important, as well as Kephart's corroboration, because it's undisputed that Bruce knew it was not an authorized interview. It wasn't authorized because he was on duty on the clock. And he, and he also knew he wasn't authorized to commandeer a bus for the purpose of conducting an interview, and then driving in an unsafe manner. Each one of those offenses, there are three under sections two, five and seven, were grounds for his termination under the last chance return award. Can you just, as I understand the policy, the policy is that it's a violation of policy to give an unauthorized interview about a matter relating to WRTA, is that right? Yes, your honor, I think that's an accurate paraphrasing. Does that mean technically you're in violation of the policy if you give an interview that touches on WRTA policy while you're not on the job and while you're not speaking as an employee? I think the, my understanding with respect to the policy, your honor, is that if you were to speak in uniform while on duty... I know that's not what I just asked you. Does the policy as written make it a violation for an employee of WRTA to give an interview with the newspaper, let's say, about their views as a commuter about RTA services in the evening while they're not on the job? I don't think so, your honor. Where can I find in the record that the policy is limited to on the job in the uniform speech? Your honor, that was presented in Mr. Parker's deposition, that it was limited to which is the private entity, right? This is a private entity that runs this bylaw in Massachusetts. And what he did is, as a concession to the request from the union funding committee, allowed people to give interviews on this issue in uniform because the speech, again, was not unhelpful or unfavorable. Management and the union were in lockstep on this issue, which concerned budget cuts, and there was no dispute. So Bruce's speech itself was nothing anyone else hadn't said. And in interviews, the issue was clearly, which he knew, was about being on the clock and in uniform at the time. With respect to that class two violation. And the policy as defined as you just defined it, did the district court do a Pickering analysis of whether that type of policy complies with the First Amendment? I think, your honor, I believe it touched on the Pickering analysis, but at the end of the day, in going through the 1983 analysis, the court found that the other two violations. What do you think we should do if we disagreed on that point? Well, your honor, I would like to see the area of disagreement. Just imagine disagreements like what Judge Howard was asking, which is that a reasonable juror could find that the violation of the interview policy was at least a piece of why he was fired and therefore be reasonable to conclude that had that piece not been there, he would not have been fired. Well, I think what that does, your honor, is I think it discounts the fact that this is an employee, also a member of the union who signed a last chance agreement, admitting that any one class two violation was enough for his termination in the discretion of management, and I don't believe that is a jury question, your honor. I think it's focused on... Could the jury find that those other two reasons listed are pretext? I don't think it can, your honor, because the problem for Mr. Bruce on that is the speech was not unhelpful. It wasn't unfavorable. Contrast that with the, you know, the situation you had in the Timberton case, or in the other cases that my brother cites, where you have a situation where it may be a no confidence vote, something where the union and management are antagonistic. What about the statement about some your nose? Doesn't that suggest that they were fairly motivated to respond in by virtue of the fact he was flouting that policy? Well, your honor, I think the problem with the pretextual analysis, right? If the thumb your nose, that type of comment, your honor, you only have to look at the factual record. In January of 2018, Mr. Bruce was involved in a preventable accident. He left the scene of an accident. That's the allegation. Management, now this is before this situation happened on February 6, 2018. So now here you have a preventable accident, Mr. Bruce is involved, the company management investigates, and they decide it's inconclusive. Now, that would have been a class one or two management did the investigation found it was inconclusive, gave him the benefit of the doubt, and did not terminate him. So to argue that there's this animus or this pretextual issue based on speech, when many other employees were engaged in the same sort of speech, doesn't match up with the factual record. I know that's what my brother is arguing, but it doesn't match the factual record. The point remains that there are these two other very serious violations that you can watch because they're all on camera, where Mr. Bruce takes his... Okay, Mr. Conte. Thank you. Thank you. Mr. Bloom, you've reserved two minutes. Thank you so much, your honor. I'd like to just make a few returns to the back and forth Mr. Conte had with you, Judge Barron, on the policy. The policy as written, as stated in the employee disciplinary policy says, number five, making unauthorized statements to the media, newspapers, TV, radio, et cetera, all statements in which an employee is representing CMTM or WTA must be pre-approved by the general manager. So I wanted to make sure that was clear. In this case, Mr. Bruce did not believe he was speaking on behalf of WRTA or CMTM. He was asked to speak as president of the union. He was so identified. So the idea that he was somehow authorizing that policy or violating that authorization policy here, he had good reason to believe he was not. I also, Mr. Conte argued that pursuant to the last chance agreement, um, Mr. Bruce was an Atwell employee. Atwell employees are still entitled to their First Amendment rights. So whether or not he was an Atwell employee, we think is irrelevant to the question before the court. Um, and I also want to clarify one thing. I just want to clarify that for your 1983 claim to work, there's got to be a First Amendment violation. Yes, your honor. First Amendment violation is, I take it you're saying that that policy doesn't comply with Pickering? We believe that that policy does not comply with Pickering. And that it played a role in his termination? Yes, your honor. Okay. Wouldn't matter whether what he thought about whether he was in compliance with it for that part of the thing. Once you can show the employer fired him for not being in compliance with it, if it violates Pickering, you have a 1983 claim. Sure. I think it's an in the alternative argument. What do you say about what Mr. Conte said about the record indicating that the policy, in fact, was only going to be applied to persons who were speaking in a setting where it was reasonable for the employer to be worried that they might be understood to be speaking on behalf of WRTA? Because that would seem relevant to the Pickering analysis. Yeah, your honor. We believe that the record is modeled on this. There's quite an extensive record and obviously the text of the policy as it was distributed differs from that. We believe they were, as a member of the Mr. Bruce was, as a member of the funding committee, allowed to speak in uniform. But certainly drawing all reasonable inferences in Mr. Bruce's favor, there is certainly, I think, a reasonable belief that could be drawn here that should go to the jury. Yeah, so I think because he was allowed to speak in uniform, I think that's issue there. I take it the district court never made a finding about what the policy scope was or how it fared under Pickering? No, your honor. The district court did not. If I, I don't know how much time I have left, I just briefly want to address the point that Mr. Conti is claiming that Mr. Bruce apologized. As Mr. Bruce said in his deposition, the apology was not for the violation stated. What Mr. Bruce said is something to the, he basically said, I apologize if I caused you any problems. He was not speaking to any of the proposed violations. And in fact, because no work orders or safety violations had been articulated to him, he couldn't have apologized for them. Thank you, Mr. Blum. Thank you. That concludes argument in this case. Attorney Blum and Attorney Conti, you should disconnect from the hearing at this time. Also, Attorney Mansfield and Attorney Kesmaric.